# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAVIER LOPEZ VILLAGOMEZ, :
   *Plaintiff*, :
: CIVIL ACTION
v. : NO.: 17-3929
:
KAOLIN MUSHROOM FARMS, INC., :
   *Defendant*. :

## MEMORANDUM

**JONES, II   J.**                                                                 **MARCH 14 , 2019**

      Plaintiff Javier Lopez Villagomez ("Plaintiff") commenced this action against Defendant Kaolin Mushroom Farms, Inc. ("Defendant") for alleged violations of his rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").  Plaintiff claims that Defendant interfered with his ability to exercise his rights under the FMLA after he advised Defendant of an injury he suffered to his right ankle that necessitated a medical leave of absence.  Additionally, Plaintiff claims that Defendant terminated him in retaliation for his attempt to exercise his rights under the FMLA.  Defendant timely moved for summary judgment on both of Plaintiff's claims.

      For the reasons that follow, the Court shall deny Defendant's Motion for Summary Judgment.  There is a genuine issue of material fact.  Specifically, whether Defendant had notice that Plaintiff's absence might be medically related, which would have triggered Defendant's duty to reach out to Plaintiff and ascertain whether his absence could be covered by the FMLA.

## STANDARD OF REVIEW

      Under Fed. R. Civ. P. 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

1

(1986). "Only disputes over facts that might affect the outcome of the suit under the governing law" are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, even where a material fact is contested, that dispute is not "genuine" unless "a reasonable jury could return a verdict for the nonmoving party." (*Id.*). When conducting this inquiry, courts may not "make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Seigel Transfer, Inc. v. Carrier Express*, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995). A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The Court recites the undisputed facts as viewed in the light most favorable to Plaintiff as the non-moving party.

### I. FACTUAL BACKGROUND

#### A. Plaintiff's April 2016 Injury

Defendant grows, packages, and distributes mushrooms. (ECF No. 25-2 [hereinafter Ayala Dep. Tr.], 20:22-21:9). Plaintiff worked for Defendant as a waterman and waterman-trainer from February 2015 until his termination on November 21, 2016. (ECF No. 25 [hereinafter Defs. SOF], ¶¶ 1-2, 51).

In April 2016, Plaintiff injured his ankle playing soccer. (Defs. SOF, ¶ 5). That same day, Plaintiff went to work and reported the injury to his immediate supervisor, Lucas Ortiz. (Defs. SOF, ¶ 6; ECF No. 27-1 [hereinafter Pltfs. SOF], ¶ 6). Afterwards, Plaintiff went and sought medical treatment. (*Id.*). The next day Plaintiff spoke with Ana Buitron from Defendant's Human Resources Department ("HR") about obtaining FMLA related paperwork

2

for his physician to complete so that he could take an FMLA-covered leave of absence. (Defs. SOF, ¶¶ 7-8; Pltfs. SOF, ¶ 7). Employees are directed to go to Ms. Buitron if they need to take any leave, including time off time due to a medical issue. (ECF No. 27-11 [hereinafter Buitron Dep. Tr.], 34:15-35:5). After completing the required paperwork and obtaining short term disability benefits, Plaintiff and Ms. Buitron remained in regular contact, speaking with one another at least once per week, during his FMLA leave. (Defs. SOF, ¶¶ 8-10; Pltfs. SOF, ¶¶ 8-10).

B. Plaintiff's November 2016 Injury

Several months after returning from his FMLA leave, Plaintiff injured his other ankle on November 16, 2016 playing soccer. (Defs. SOF, ¶ 13). The morning after sustaining his injury, Plaintiff awoke with significant pain in his ankle. (Defs. SOF, ¶ 15). Realizing he could not walk, Plaintiff left a voicemail with Defendant's HR Director, Iris Ayala. (Defs. SOF, ¶¶ 15-16, 28-29, 31; Pltfs. SOF, ¶¶ 28-29, 31). As Director of HR, Ms. Ayala oversaw staff hired to do specific roles such as monitor attendance, track leave, etc. (Ayala Dep. Tr., 22:22-23:21). In his voicemail, Plaintiff said, at least in part:

> My name is Javier Lopez Villagomez employee number [] and I'm just calling in to let you guys know that I'm not going to be able to make it into work today because I had an accident outside of work.

(Defs. SOF, ¶ 28; ECF No. 25-1 [hereinafter Pltfs. Dep. Tr.], 41:15-22; 42:21-43:4; 44:5-12).[1]

---

[1] Jim Felty, the Director of Information Technology for Defendant, declared under penalty of perjury that he recovered the voicemail message left by Plaintiff on November 17, 2016 from the company's archives. (ECF No. 25-3 [hereinafter Felty Dec.], ¶¶ 1, 3). Ms. Ayala's voicemail was "set up to record audio messages left on her voicemail and [sic] a copy delivered to her email account." (Felty Dec., ¶ 6). Mr. Felty avers that he "turned over the entire .wav file, in its native and unaltered form . . . [and] preserved the email to which the .wav file was attached as a .pdf file and produced it to counsel." (Felty Dec., ¶ 10). Moreover, Mr. Felty avers that he "did not alter, crop, or modify the .wav file containing the 11/17/16 voicemail message or its content in any way." (Felty Dec., ¶12).

3

When the produced voicemail was played at his deposition, Plaintiff testified that although it was his voice in the voicemail, he "believe[s] there was more to it." (Pltfs. Dep. Tr., 45:20-21, 46:10-11). Plaintiff recalled leaving information about "letting them [Defendant] know about the time off [he] needed . . . [and] some content of [him] explaining [his] injury." (*Id.*). Plaintiff also attempted to contact his supervisor, Mr. Ortiz, but he did not answer the phone. (Pltfs. SOF, ¶ 73).

Plaintiff received medical care for his injury on November 17, 2016 at Jennersville Hospital and December 2, 2016 at First State Orthopedics. (ECF No. 27-3, pp. 1, 3).[2] He testified that after he went to the Jennersville Hospital emergency room and was told he had a fracture, he asked his brother when he came home from work that day to tell Mr. Ortiz about his broken leg. (Pltfs. Dep. Tr., 30:23-35:22).

Plaintiff's brother, Jesus Lopez Villagomez, worked for Defendant as a waterman from July 2016 until February 2017. (Defs. SOF, ¶ 35). Mr. Jesus Villagomez testified that on November 17, 2016 he spoke to Mr. Ortiz about his inability to work that day because Plaintiff, who usually drove him to work, was injured. (Pltfs. SOF, ¶ 37; *see also* ECF No. 27-7 [hereinafter Jesus Villagomez Dep. Tr.], 22:20-23:18, 24:3-10). Specifically, Mr. Jesus Villagomez testified as follows:

> Q: So your – your brother hurt his ankle on 11/16, so November 16th, in the evening of November 16th.
>
> A: Uh-huh.
>
> Q: The next morning you were su – you were both supposed to work; correct?

---

[2] Plaintiff testified that he went to the Jennersville emergency room both on Saturday the ***17th*** and Saturday the ***19th***. (Pltf. Dep. Tr. 32:6-17). Plaintiff's medical records confirm he went on Saturday, November 19, 2016. (ECF No. 27-3, pp. 1, 3).

4

> A: Yes.
>
> Q: And at what time that day did he tell you that he wasn't going to be able to go to work?
>
> A: I believe like around like morning like because we would usually get up like around the same time so it was around like 6:00 – like, yeah, like around like 6:00 in the morning.
>
> \*\*\*
>
> Q: Okay. And you – I believe you contacted a supervisor or something that day?
>
> A: Yeah, I contacted Lucas.
>
> Q: Okay, was it Lucas or was there another supervisor?
>
> A: No, I'm pretty sure it was Lucas.
>
> \*\*\*
>
> Q: Okay. And what did you tell Lucas when you called in that day?
>
> A: That I wasn't going to be able to come into work because my brother fractured his – or like he hurt his – his ankle –
>
> Q: Okay.
>
> A: -- and I didn't have a ride to – to go in.

(*Id*.). Mr. Jesus Villagomez testified that he also informed Mr. Ortiz about Plaintiff's injuries on Saturday, November 19, 2016. (Pltfs. SOF, ¶ 79).[3]

---

[3] Defendant staunchly argues that Mr. Jesus Villagomez's statements about informing Defendant of the nature and extent of Plaintiff's injuries are not true. (*See* Defs. SOF, ¶¶ 55-60; *see also* ECF No. 25-1 – Villagomez Cert., pp. 44-51). Defendant also contends that Mr. Jesus Villagomez testified that he did not speak with their supervisor, Mr. Ortiz, until December 1, 2016. (Defs. SOF, ¶¶ 79; ECF No. 29, B.). The passage from Mr. Jesus Villagomez's transcript that Defendant relies upon for this proposition states:

> Q: When was the next time you spoke with somebody about your brother? Let me clarify that. When was the next time you spoke with somebody from Kaolin about your brother?
>
> A: I think it was that same week.

Mr. Ortiz, on the other hand, testified that he never spoke to Mr. Jesus Villagomez. (ECF No. 27-10 [hereinafter Ortiz Dep. Tr.], 33:12-35:3). Moreover, Mr. Ortiz claims that he never knew that Plaintiff had been involved in an accident, sustained an injury, or that he was absent due to a medically related issue. (Ortiz Dep. Tr., 27-10, 32:1-15). However, whether Mr. Ortiz's recollection is accurate on this point has also been drawn into question. Mr. Ortiz testified that when he did not hear from Plaintiff or see him at work for three days, he informed his supervisor, Samuel Santucci. (Ortiz Dep. Tr., 30:24-31:15). Mr. Santucci, on the other hand, testified that Mr. Ortiz did not inform him about Plaintiff's extended absence from work. (ECF No. 27-9 [hereinafter Santucci Dep. Tr.], 35:11-16). According to Mr. Santucci, he became aware of Plaintiff's absence from Ms. Ayala; though Mr. Ortiz generally would have communicated this information. (Santucci Dep. Tr., 39:2-40:3). Damaris Carrera, the individual responsible for monitoring attendance at that time, also sent Mr. Santucci an email stating that Plaintiff had called off from work because of an accident. (Santucci Dep. Tr., 40:4-23; Ayala Dep. Tr., 22:22-23:21).

Plaintiff was not present for the alleged conversations between his brother and Mr. Ortiz.

---

Q: The following week then?

A: No, I think it was like the or – I don't know. It's just been – it's been so long.

\*\*\*

Q: So here's a calendar, let's try and make this easier. Here's a calendar from November 2016 showing Thursday the 17th, Friday the 18th, following Monday the 21st, when would you say the first day is that you spoke with someone about your brother?

A: I believe maybe like Thursday the – the 1st of December.

(Villagomez Dep. Tr., 26:19-29:24).

6

(Pltfs. Dep. Tr., 49:2-50:12). However, by the Monday following his accident, November 21, 2016, Plaintiff expected a call from HR and/or FMLA paperwork to be mailed to him like when he was injured in April 2016. (Pltfs. Dep. Tr., 36:19-37:6). Plaintiff had these expectations because he'd asked his brother to speak with Mr. Ortiz and had left a voicemail for Ms. Buitron. (*Id*.). It never occurred to Plaintiff to contact someone in HR when he didn't hear from anyone or receive his FMLA paperwork. (Pltfs. Dep. Tr., 64:16-65:1).

On December 17 or December 18, 2016, Plaintiff went to HR with documentation about his injury, but he had not personally contacted anyone in HR since November 17, 2016. (Defs. SOF, ¶¶ 25, 27); Pltfs. Dep. Tr., 37:22-38:15). When Plaintiff went into HR he attempted to provide Ms. Ayala with his paperwork but she refused to accept it, telling him that he was terminated and that he could reapply for his position. (Pltfs. Dep. Tr., 51:12-52:9, 63:5-10). Ms. Ayala testified that Plaintiff never returned to her with medical documentation of any kind. (Ayala Dep. Tr. 136:7-22).

      C. <u>Plaintiff's Termination</u>

The Attendance and Punctuality Policy (the "Attendance Policy") in effect at the time of Plaintiff's termination required employees to call the "call-out line" at least an hour prior to their scheduled shift whenever they would not be able to report to work as scheduled. (Defs. SOF, ¶ 41; Pltfs. SOF, ¶ 41). When making such a call, the Attendance Policy instructed employees to "identify the reason for the absence and the anticipated return to work date." (Defs. SOF, ¶ 42; Pltfs. SOF ¶ 42). The Attendance Policy also provided that "employees who are absent from work for three consecutive days without good cause and without giving proper notice to the company shall be considered as having quit." (Defs. SOF, ¶ 44; Pltfs. SOF ¶ 44). Proper execution of this policy required two calls – one to HR and the other to the individual's

supervisor – with the employee's name, ID number, reason for calling out, date, and time. (Santucci Dep. Tr., 27:19-28:7; Ayala Dep. Tr., 24:5-24). However, HR has also accepted notes from family or siblings as providing notice of the need for a medically related leave. (Pltfs. SOF, ¶¶ 34, 87; Ayala Dep. Tr., 40:2-13).

In 2016, when an employee had been absent from work for a known medically related issue, Ms. Buitron would reach out via phone to inquire about the issue and any assistance the employee may need. (Ayala Dep. Tr., 30:19-31:22, 33:11-23). If an employee had a medical issue that was potentially covered by FMLA, the employee didn't have to specifically request FMLA paperwork to trigger Ms. Buitron's duty to provide it. (Ayala Dep. Tr., 37:8-13). The employee simply needed to provide her with enough information "on their medical condition that would allow Ana [Ms. Buitron] to see that they would need to be out, or they would need to be interim." (Ayala Dep. Tr., 37:14-20). However, where an employee had been absent, and it was unknown if it was for a medically related reason, there was no policy or practice in place directing someone from HR to reach out to the employee to see if the absence was medically related. (Ayala Dep. Tr., 38:6-13).

On November 20, 2016, Ms. Ayala emailed Plaintiff's supervisors and cc'd Ms. Buitron regarding Plaintiff's absence from work without calling off since November 18, 2016. (Defs. SOF, ¶¶ 46, 48; Pltfs. SOF ¶¶ 46, 48; ECF No. 27-15). Ms. Ayala stated that Plaintiff was "considered a 3 day no call no show and [could] be terminated upon Sam [Santucci] or Dennis [Melrath]'s approval." (ECF No. 27-15). Additionally, she stated that "[i]f he [Plaintiff] has called I have cc'd Ana to follow up on his medical issue." (*Id.*). Where an employee is absent in violation of the Attendance Policy, Ms. Ayala has "often" emailed Ms. Buitron asking whether she had any additional information, including notes or calls, regarding the employee's absence if

8

the absence concerned a medical condition. (ECF No. 27-11 [hereinafter Buitron Dep. Tr.], 31:9-35:5). However, Ms. Buitron testified that the only circumstances under which she has been asked to follow up with an employee who has missed work in violation of the Attendance Policy is "[w]hen we know that it's a medical condition." (Buitron Dep. Tr., 34:15-35:5). Additionally, Ms. Ayala testified that although she didn't know what type of accident Plaintiff had, when she wrote the November 20th email she possessed enough information to instruct someone from HR to follow up with him about potential medical issues. (Ayala Dep. Tr., 110:22-111:23).

After Plaintiff had been absent for three days, it was determined that he would be terminated. (Santucci Dep. Tr., 45:19-23). Though he was unable to recall specifically, Mr. Santucci likely spoke to Ms. Ayala, as the HR representative, and Mr. Ortiz, as Plaintiff's supervisor, before terminating Plaintiff. (Santucci Dep. Tr., 45:19-46:16, 47:8-49:3). Mr. Santucci did not recall any discussion about potential medical issues or being informed that someone from HR followed up with Plaintiff about whether his absence was medically related. (*Id*.).

## II. PROCEDURAL HISTORY

On August 31, 2017 Plaintiff filed his Complaint against Defendant. (ECF No. 1). After Defendant filed its Answer on November 6, 2017, Plaintiff and Defendant (collectively, the "Parties") proceeded with discovery. Defendant filed the pending Motion for Summary Judgment on August 22, 2018. (ECF Nos. 23-26). Plaintiff filed his Opposition on September 7, 2018. (ECF Nos. 27, 29).[4] This matter is fully briefed and ripe for adjudication.

---

[4] Plaintiff entitled his Opposition to Defendant's Motion for Summary Judgment, "Plaintiff's Memorandum of Law in Support of His Motion for Partial Summary Judgment." (ECF No. 27 [hereinafter Pltfs. Opp. to MSJ], p. 1]. As the Court was unable to discern any argument in favor

**DISCUSSION**

**I. Family and Medical Leave Act**

Under the FMLA, eligible employees are entitled to 12 workweeks of leave during any 12-month period due to their own serious health condition. 29 U.S.C. § 2912(a)(1). Notice of FMLA leave must be given as soon as practicable where the need for leave was not foreseeable. 29 C.F.R. §§ 823.302(a). Notice of an unforeseeable leave must "comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances," and include "sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. §§ 823.303(b), (c).

Courts have held the notice element is "not a formalistic or stringent standard." *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 303 (3d Cir. 2012). "The key consideration for determining whether the employee's notice was adequate 'is how the information conveyed to the employer is reasonably interpreted.'" *Betz v. Temple Health Systems*, No. 15-0727, 2016 WL 147155, *10 (E.D. Pa. Jan. 13, 2016) (quoting *Sarnowski v. Air Brooke Limousine, Inc.*, 510, F.3d 398, 402 (3d Cir. 2007). "This is generally a question of fact, not law." *Id*. However, "where the employer does not have sufficient information about the reason for an employee's use of leave, *the employer* should inquire further of the employee … to ascertain whether leave is potentially FMLA-qualifying." *Lichtenstein*, 691 F.3d at 303 (emphasis in original) (quoting 29 C.F.R. § 825.303(a)). Consequently, the regulations clearly contemplate scenarios where an employee may satisfy his "notice obligation without providing enough detailed information for the employer to know if the FMLA *actually* applies." *Lichtenstein*, 691 F.3d 294 at 303 (emphasis added). The FMLA makes it "unlawful for any

---

of Plaintiff obtaining summary judgment, the Court construed the Opposition purely as arguing for the denial of Defendant's Motion for Summary Judgment.

employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" thereunder. 29 U.S.C. § 2615(a).

### III. Defendant's Motion for Summary Judgment Must be Denied

The Court may only grant summary judgment where the moving party is entitled to judgment as a matter of law. This means there can be no genuine issue of material fact or need for the Court to make credibility determinations regarding the testimony of witnesses who tell conflicting stories of events, because doing so is within the province of the factfinder, and not the Court, at this posture. *Betz*, 2016 WL 147155 at *10. Plaintiff has alleged two claims under the FMLA for interference and retaliation. However, there are genuine issues of material fact regarding each claim that would require the Court to make credibility assessments to resolve. Accordingly, the Court must deny Defendant's Motion for Summary Judgment.

A. Interference Claim

To succeed on his interference claim, Plaintiff must prove: (1) he was an eligible employee under the FMLA; (2) Defendant was subject to the FMLA's requirements; (3) he was entitled to FMLA leave; (4) Plaintiff gave Defendant notice of his intention to take FMLA leave, and (5) Defendant denied Plaintiff benefits to which he was entitled under the FMLA. *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).

There is no dispute that Plaintiff meets the first three elements, (*see* Pltfs. SOF, ¶¶ 65-66; *see also* Pltfs. Opp. to MSJ, p. 6), but the Parties hotly dispute elements four and five. As it is undisputed that Plaintiff did not take FMLA leave for his November 2016 injury, the question is whether he provided Defendant with sufficient notice of his need for FMLA leave. If so – Defendant denied Plaintiff of benefits to which he was entitled by not providing him with the appropriate paperwork. If not – Plaintiff does not have a claim.

11

Plaintiff claims that he provided Defendant with enough information to put Defendant on notice of his need for FMLA leave. ***First***, Plaintiff points to his voicemail to Ms. Ayala, telling her that he would not be coming into work due to an accident. (Pltfs. Opp. to MSJ, p. 10). ***Second***, Plaintiff relies upon his brother's communications with their supervisor, Mr. Ortiz, about Plaintiff's injury on at least two occasions. (*Id*.). When the conversation between Plaintiff's brother and Mr. Ortiz this took place is unclear, but there is both sworn testimony and a certification submitted under penalty of perjury attesting to the fact that these conversations took place. (Pltfs. Opp. to MSJ, p. 10-11). ***Third***, Plaintiff notes that when he was injured in April 2016, a member of HR reached out to him with FMLA paperwork. He expected the same thing to happen with his November 2016 injury. (Defs. SOF, ¶¶ 8-10; Pltfs. SOF, ¶¶ 8-10).

Defendant disputes that Plaintiff provided it with enough information to reasonably ascertain that Plaintiff's "accident" might be covered by the FMLA. (ECF No. 24 [hereinafter Defs. MSJ], pp. 13-14). Defendant first argues that Plaintiff's voicemail to Ms. Ayala, stating the he'd "had an accident," – his only direct communication with Defendant from November 16, 2016 until December 17, 2016 – did not sufficiently apprise it of Plaintiff's potential need for FMLA leave. (Defs. MSJ, p. 13). According to Defendant, courts have found notice such as this to be patently deficient because it fails to communicate the basis for needing leave, or indeed, any information at all about the underlying medical condition. (Defs. MSJ, pp. 12-14); *see also Sarnowski*, 510 F.3d at 403. Additionally, Defendant contends that although Plaintiff argues that he believes he said more in his voicemail, without evidence to that effect, Plaintiff's recollection cannot call into question a recorded message, the authenticity of which has been sworn to by Defendant's Director of Information Technology. (Defs. MSJ, pp. 13-14). Finally, even if this were all not the case, Defendant argues that Plaintiff's voicemail did not comply with the

Attendance Policy because it didn't include the requisite level of detail.  (*Id*.).

Next, Defendant argues that Plaintiff's belated argument that his brother informed their supervisor about the nature and extent of Plaintiff's injury is a clear fabrication and deficient as a matter of law.  (Defs. MSJ, pp. 14-16; *see also Satterfield v. Wal-Mart Stores*, 135 F.3d 973 (5th Cir. 1998)).  As to Mr. Jesus Villagomez's testimony, Defendant argues that his certification attesting to the individuals he informed about Plaintiff's injuries is a "sham."  (Defs. MSJ, p. 14 n. 2).  Moreover, Defendant contends that the certification directly contradicts his own testimony that the earliest date on which he informed Mr. Ortiz or Mr. Santucci about Plaintiff's injuries was December 1, 2016.  (*Id*.).

Consequently, as reasonable jurors could disagree about when, if at all, Defendant learned that Plaintiff's absence from work was medically related, thereby triggering its duty to reach out to Plaintiff to determine if FMLA benefits would be applicable, there exists a genuine issue of material fact that warrants denial of Defendant's motion.

B.  <u>Retaliation Claim</u>

To succeed on his FMLA retaliation claim, plaintiff must prove that he: "(1) invoked h[is] right to FMLA-qualifying leave, (2) [] suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights.  *Ross*, 755 F.3d at 193.

Whether Plaintiff invoked his right to FMLA-qualifying leave depends on whether he gave Defendant enough information about the nature and extent of his injuries to reasonably trigger's Defendant's affirmative duty to inquire as to whether he was eligible for FMLA leave.  As there are genuine issues of material fact concerning this issue for the reasons stated above, Defendant's motion must be denied as to this claim as well.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is denied. An appropriate Order follows.

BY THE COURT:

*/s/ C. Darnell Jones, II*
C. DARNELL JONES, II     J.